# United States District Court

## SOUTHERN DISTRICT OF INDIANA

**UNITED STATES OF AMERICA**

**v.**

**KYLE EDWARD COX**

**CRIMINAL COMPLAINT**

CASE NUMBER: 1:16-mj-0096

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.   In or about October 2015 through December 2015, in Marion and Hamilton County, in the Southern District of Indiana defendant did,

Count 1 – Coercion and Enticement in violation of Title 18, United States Code, Section 2422(b)

I further state that I am a Task Force Officer, and that this complaint is based on the following facts:

See attached Affidavit

**Continued on the attached sheet and made a part hereof.**

_____
Task Force Officer, Darin Odier, FBI

**Sworn to before me, and subscribed in my presence**

February 4, 2016
**Date**

at    Indianapolis, Indiana

Mark J. Dinsmore, U.S. Magistrate Judge
**Name and Title of Judicial Officer**

_____
Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF ARREST WARRANT

I, Darin Odier, hereby depose and state as follows:

1.     **Affiant**: I am a Detective in the Cybercrime Unit of the Indianapolis Metropolitan Police Department. I am also a cross-designated Task Force officer assigned to the FBI the Indianapolis Violent Crimes Against Children Task Force. I have over 26 years of law enforcement experience. I have investigated State and Federal criminal violations related to high technology or cybercrime, child exploitation, and child pornography. I have written numerous search warrants involving internet crimes against children cases and participated in their execution. I have attended the Crimes Against Children Conference in Atlanta, Georgia and attended numerous classes related to investigating the online sexual exploitation of children. I am also a member of the Indiana Internet Crimes Against Children Task Force, which includes numerous federal, state and local law enforcement agencies. I am currently assigned to operate in an undercover capacity on the Internet to identify and investigate persons attempting to exploit or solicit sexual acts with children or trafficking in child pornography. As a Task Force Officer, I am authorized to investigate violations of the laws of the United States and to execute warrants issued under the authority of the United States.

2.     **Information provided**: The statements in this affidavit are based on information obtained from my observations and communications, as well as information learned from other law enforcement officers and witnesses

including Det. Laura Smith of the Indianapolis Metropolitan Police Department digital forensics unit. Because this affidavit is being submitted for the limited purpose of securing an arrest warrant, the affiant has not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the person listed below has committed criminal offenses.

3. **Requested action**: I make this affidavit in support of an application for a Criminal Complaint and Arrest Warrant for **Kyle Edward COX (W/M xx-xx-1984)**, a resident of Fishers, Indiana, for an offense committed in the Southern District of Indiana.

4. **Coercion and Enticement (18 U.S.C. § 2422(b))**: This statute provides that "Whoever, using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 10 years or for life." This statute incorporates both state and federal law in determining whether the underlying sexual activity is a criminal offense, including federal law prohibiting the sexual exploitation of a child, and attempts to do so (18 U.S.C. § 2251(a) and Indiana law prohibiting sexual misconduct with a minor (35-42-4-9).

5. **Sexual Exploitation of a Child (18 U.S.C. § 2251(a))**: This statute provides that "Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, shall be punished as provided under subsection (e), if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed. It is also a crime to attempt to sexually exploit a child. 18 U.S.C. § 2251(e).

6. **Sexual Misconduct with a Minor (Indiana Code 35-42-4-9)**: This statute prohibits including sexual intercourse, other sexual conduct, and / or touching or fondling with the intent to arouse or satisfy sexual desires, between a person who is at least 18 years of age and a child who is 14 or 15 years old.

7.     **Probable Cause:** For the reasons listed below, there is probable cause to believe that **Kyle Edward COX (COX)** has committed an offense, and attempted to do so:

8.     **COUNT ONE (COERCION AND ENTICEMENT):** Between in or about October 2015 and in or about December 2015, COX, using the mail or any facility or means of interstate or foreign commerce, did knowingly persuade, induce, entice, and coerce, and did attempt to persuade, induce, entice, and coerce, any individual who has not attained the age of 18 years, that is CHILD VICTIM 1, to engage in any sexual activity for which any person can be charged with a criminal offense, including Sexual Exploitation of a Child and Sexual Misconduct with a Minor among other offenses, in violation of 18 U.S.C. § 2422(b).

9.     **Definitions:** The following definitions apply to this Affidavit and its Attachments:

a.     The term "minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

b.     The term "visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

c.     The term "sexually explicit conduct" means actual or simulated:

1) Sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same sex or opposite sex;

2) Masturbation;

3) Sadistic or masochistic abuse; or

4) Lascivious exhibition of the genitals or pubic area of any person.

### THE INVESTIGATION

10. During the first semester of the 2015-2016 school year, COX was a teacher and basketball coach at Park Tudor High School in Indianapolis, Indiana. Over a period of approximately four months, COX established an improper relationship with a 15 year old girl, who was attending the school. COX repeatedly communicated with her in ways that went well beyond normal student-teacher interactions involving school-related activities.

11. COX began sending sexually explicit messages to coerce, induce, entice and persuade the child to send sexually explicit depictions to him. He also attempted to coerce and entice the child to engage in illegal sexual activity with him and to meet him for this purpose. Because COX was her teacher, it was illegal for him to engage in such sexual activities with any similarly situated minor under the age of 18 years. If COX had not been a teacher, it still would have been illegal for him to engage in such activity with this child, because the girl was not yet 16 years old. Nevertheless, Cox devised a plan to take the student to his home, while his wife and children were out of town, so

that he could engage in sexually explicit conduct with her and produce visual depictions. This was not the first such plan. COX also tried to convince her to meet him for sexual activity at school. COX's final plan to take the girl to his home was only disrupted when the girl's father discovered the related electronic communications and determined that they involved a teacher. The girl's father then reported his information to the school beginning on December 14, 2015.

12.     Throughout this affidavit, the minor child in question will be referred to as CHILD VICTIM 1. At all times relevant to this investigation, this child was less than 16 years of age, but was over the age of 13. COX was, from at least August of 2015 until December 15, 2015, an employee of Park Tudor High School and was a teacher of CHILD VICTIM 1. COX was a 31 year old man.

13.     On December 15, 2015, an Indiana State 310 report was filed by the Associate Head of School for External Affairs at Park Tudor School concerning COX and CHILD VICTIM 1. The 310 report indicated that a former employee of the school, identified as COX, had sent text messages to a student. The report indicated that COX was a teacher of CHILD VICTIM 1, who was 15 years of age. The report referred to the messages as being suggestive and not appropriate for an adult teacher to send to a student.

14.     The reporter believed that COX and the student did not actually meet up and there was no physical contact between them at school or outside

of school. The reporter also claimed not to know if pictures were exchanged between COX and the student.

15. The reporting school employee said that COX was terminated on December 15, 2015. The 310 report indicated that COX did not deny sending messages to CHILD VICTIM 1 and receiving messages from her.

16. The 310 report does not indicate that the school or anyone else was then in possession of the text messages or other evidence of the communications between COX and CHILD VICTIM 1.

17. On December 22, 2015, a second Indiana State 310 report regarding COX and CHILD VICTIM 1 was filed by a counselor not employed by the school. This 310 report discussed the sending of videos and images between COX and CHILD VICTIM 1 that were sexually explicit in nature.

18. **DCS interview:** On January 4, 2016, Det. Laura Smith spoke with Mr. Mike Abell ("Abell"), who is the Indiana Department of Child Services ("DCS") assigned caseworker. He arranged for a meeting with CHILD VICTIM 1 and her parents at the Child Advocacy Center.

19. During a conversation on January 4, 2016, the father of CHILD VICTIM 1 ("FATHER") told Abell that he had taken the phone of CHILD VICTIM 1 and learned of the text messages between COX and CHILD VICTIM 1. On December 14, 2015, FATHER contacted and met with administrators at Park Tudor and told them about the messages.

20. FATHER told Abell that he made screen shots of the messages, which were taken from his daughter's phone.

21.   When FATHER spoke with school administrators on December 14, 2015, they requested to review the messages and FATHER allowed them to have his computer overnight to review the messages.  He also provided hard copies of some of the text messages.  These included a sexually explicit image of a minor.

22.   FATHER advised Abell that he was concerned about how an investigation would affect his daughter.  FATHER asked to delay the interview of his daughter scheduled for January 4, 2016, due to her being in counseling.  FATHER stated that Park Tudor had all of the information related to the investigation.

23.   As of this date, January 4, 2016, the investigators did not have possession of any of the related text messages or documents provided to the school.

24.   **Meeting at Park Tudor**:  On January 5, 2016, Det. Smith went to Park Tudor School to speak with the original State 310 reporter.  This person advised that she was the person responsible for making the first 310 report on December 15, 2015, but said that she did not have any independent information.  The administrator said that she was provided the information for the report by an attorney representing the school.  She made the report, which she felt she had an obligation to do.  She advised that we needed to speak with the attorney representing the school and provided his number.

25. After leaving Park Tudor, Det. Smith spoke with the attorney for Park Tudor, who advised that he was unable to help because of what he said were privileged communications and would not provide further information.

26. Det. Smith explained to the school attorney the necessity of investigating the incident and attempted to find out who had the text messages and information necessary to move forward with the investigation. The attorney said that school officials and their representatives only had the computer for a short time and that it was returned to the father. The attorney advised that he felt Park Tudor had done everything that they needed to do. He cited attorney/client privilege with his client, Park Tudor, in refusing to provide additional information.

27. **Search warrants:** On January 7, 2016, Det. Smith requested and received search warrants from Marion County Superior Court, Criminal Division Room 4, for these and other locations and person, among other places:

    a.    Park Tudor High School at 7200 N. College Avenue, Indianapolis, IN;

    b.    Residence of Kyle COX (12xxx Xxx Place, Fishers, IN. Address is known to law enforcement) and

    c.    Person of Kyle COX (w/m, date of birth XX-XX-XXXX. DOB known to law enforcement and included in the warrant).

28. All locations listed above and all events in question are located in the Southern District of Indiana.

29.     On January 7, 2016, the affiant, Det. Smith, and other federal, state and local law enforcement officers (who were members of the Indiana Crimes Against Children Task Force) went to the home of Kyle COX to serve search warrants for his residence and person.  COX was located inside the residence.  When first observed, COX had a cellular phone in his right hand, which was then confiscated per the search warrant.  COX was provided copies of the search warrants.

30.     After leaving the COX residence, a search warrant was served at Park Tudor High School.  Pursuant to the warrant, employment records for Mr. COX were obtained.  A cellular phone number for Kyle COX found in these records is listed as 765-***-****.  For the reasons described below, this telephone number was significant.

31.     During the search of Park Tudor, on January 7, 2016, the school attorney came to the scene.  The attorney eventually disclosed that he received a laptop and documents which FATHER had provided to Park Tudor, approximately 3 weeks earlier, on December 14, 2015.  The laptop and documents contained a visual depiction of a minor engaged in sexually explicit conduct.  The attorney took the laptop and documents from FATHER and transported them to his law firm office.  The contents of the laptop and documents were duplicated and placed on a thumb drive.  No information about these steps or the related text message or documents was timely provided to any law enforcement agency or the Department of Child Services (DCS).  These agencies – law enforcement and DCS - did not know before the

search at the school that that the attorney retained copies of the visual depictions of a minor engaged in sexually explicit conduct and the related communications provided by FATHER.

32.    The attorney couriered the laptop containing the visual depictions of a minor engaged in sexually explicit conduct and text messages back to Park Tudor on December 16, 2015.

33.    On January, 7, 2016, the day the search warrant was executed, Det. Matthew Shores of IMPD went with the attorney to the attorney's office to retrieve those items of evidence located there. After obtaining those items, the investigators were able to confirm that the screen shots of the text message conversations, which FATHER had captured and saved, showed extensive communications between COX and CHILD VICTIM 1. COX was identified in the messages with the contact name "Edward" and a phone number of 765-***-****. This was the same cell number listed in the Park Tudor personnel file for Kyle COX.

34.    On January 7, 2016, this affiant and Detective Kurt Spivey, who is also a Task Force Officer with the FBI and Detective with IMPD, went to the residence of CHILD VICTIM 1. At that location, I obtained the cellular phone belonging to FATHER, the former cellular phone of CHILD VICTIM 1, and the laptop computer storing screen shots of evidence. FATHER voluntarily provided passcodes for these devices.

35.    **Interview of Child Victim 1's Father:** I spoke with the father ("FATHER") of CHILD VICTIM 1 about the circumstances of the investigation.

36.     On November 28, 2015, FATHER found nude images on CHILD VICTIM 1's cell phone. When questioned by her father, CHILD VICTIM 1 initially said the images were of herself and another minor. However, a name used in the messages was "CKC". FATHER deleted the images and messages believing that they reflected poor choices between two adolescents and without adult involvement. He also began looking at CHILD VICTIM 1's phone more often. FATHER did not know that the activity in question involved any adults.

37.     On December 12, 2015, FATHER saw a thread between CHILD VICTIM 1 and "Edward" from December 3, 2015 to December 12, 2015. In the thread, "Edward" wrote that he was sad because his grandfather had died in New Castle. FATHER conducted a "Google" search on obituaries in New Castle and found a recently deceased man named "Edward COX." FATHER also found out that COX's middle name is Edward. When confronted by her father, CHILD VICTIM 1 admitted that the conversations were with COX. FATHER said he observed that the thread of messages showed that COX had asked CHILD VICTIM 1 for inappropriate depictions. COX also planned to meet CHILD VICTIM 1 for sexual purposes at COX's house on December 19, 2015. FATHER took screen shots of the text messages and images, which he provided to me.

38.     FATHER said that he took hard copies of some of the text messages and CHILD VICTIM 1's computer to Park Tudor and gave them to the head of the school and the school attorney. FATHER also told them what had been going on between COX and his daughter.

39.     FATHER then received the computer from the head of school the next day. When FATHER turned it on, FATHER said that a message appeared on the screen showing that a USB device had been removed improperly.

40.     FATHER did not receive back the hard copies of the text message between COX and CHILD VICTIM 1, including the message containing a visual depiction of a minor engaging in sexually explicit conduct.

41.     FATHER believed that Park Tudor would handle notifications to authorities because he had reported the conduct to them and had given them the evidence.

42.     In the presence of this affiant, FATHER copied the screen shots that FATHER had saved and provided them to me.

43.     FATHER also provided this affiant with the cell numbers of CHILD VICTIM 1's former and current phones.  They are 317-***-**** and 317-***-****.

44.     **Interview of Child Victim 1**:  On January 11, 2016, Det. Smith met with CHILD VICTIM 1 to conduct an interview.  During the interview, CHILD VICTIM 1 reported that COX began texting her in the middle of September 2015, when COX was her teacher.  COX started asking her weird questions and things escalated from there.  COX followed her on Instagram[1],

---

[1] **Instagram** is "an online mobile photo-sharing, video-sharing, and social networking service that enables its users to take pictures and videos, and share them on a variety of social networking platforms. In 2013, INSTGRAM users were able to privately share photos and videos through a feature called Instagram Direct. In September 2015, Instagram Direct received a major update, adding new features such as instant messaging, adding more than one user & sharing more than one photos in a single conversation, and sharing post & profiles from feeds directly to the user." *Wikipedia,* *https://en.wikipedia.org/wiki/Instagram*

but she couldn't remember exactly how COX had received her cellular phone number. She advised that his phone number started with the area code of 765.

45. When COX started texting her, CHILD VICTIM 1 said that the conversations made her feel uneasy and were unexpected. Most of the time, CHILD VICTIM 1 said that they had normal conversations about basketball, Chemistry, and school. But then over time, the conversations turned to sexual matters. COX told her sexual things that he wanted to do with her.

46. CHILD VICTIM 1 said that COX's initial text conversations and his requests for pictures (by means of text messaging) seemed innocent. Over time, however, when COX received an image, he commented on it and then he "coaxed" her into sending more explicit images as the weeks went on.

47. COX sent CHILD VICTIM 1 images of his penis through text messages or other internet- or cellular-based services. CHILD VICTIM 1 said that sometimes COX would just surprise her with a picture. She described that none of the penis images that COX sent contained COX's face in them.

48. CHILD VICTIM 1 said that she did not create or possess any sexually explicit images or videos on her phone before COX's wanted them. She said that COX, through text messages or other internet- or cellular- based services, said that he wanted her to send specific types of images and videos. These included nude images she described in the interview. She said she also sent videos to COX, using her cellular phone service and / or other internet-based services. She said COX asked for specific videos and some were of her

engaged in sexually explicit conduct. She said that COX typically asked her to send him an image and/or video and then would later make favorable comments about the content. COX also told her that he would masturbate to the images and videos.

49.    After COX began sending text messages to CHILD VICTIM 1, he gave her a role on the team he coached. CHILD VICTIM 1 said that during her school day, she would spend a lot of time with COX in his office.

50.    In the interview with CHILD VICTIM 1, she advised that she and COX used a social media app called "Snapchat" (described below) to exchange videos and images. CHILD VICTIM 1 provided the Snapchat account username for COX, which was "bigsilkysmooth". CHILD VICTIM 1 also stated that she and COX communicated over the social media app Instagram.

51.    CHILD VICTIM 1 said that COX developed a plan for him take her to his house on Saturday, December 19, 2015 for the purpose of engaging in sexual activity that would constitute a violation of Indiana Code 35-42-4-9. A greater description of this plan will be detailed below.

52.    CHILD VICTIM 1 said that COX also tried to get her to meet him at the school for the purpose of engaging in sexual activity.

53.    CHILD VICTIM 1 said she deleted the images and videos off of her phone routinely because her father would upload pictures to a photo stream.

54.    CHILD VICTIM 1 indicated that the phone contacts listed as "Edward," "CKC," and "KC" were actually Kyle COX.

55.     CHILD VICTIM 1 said that when she initially got caught sending images to COX, using the contact name "CKC," she told her father that she was communicating with another minor.  She then changed Cox's contact name in her phone to "Edward."

56.     After her parents became aware that the person sending and receiving the images was not a classmate, but rather COX, CHILD VICTIM 1 spoke with COX on approximately December 14 or 15, 2015.  By that time, COX had received a phone call from the Park Tudor administration requesting a meeting.

57.     CHILD VICTIM 1 said that COX sent her messages using Instagram[2] and told her that she needed to lie about their relationship if she wanted COX to stay at Park Tudor.   COX wanted her to falsely claim that she created both sides of all of the text messages.

58.     CHILD VICTIM 1 told COX that she was freaking out and that her father already had the texts.  COX told her that he was going to be in a lot of trouble if she told the truth about what had happened.  CHILD VICTIM 1 responded that she couldn't lie.  She told COX that it was not her decision.  COX then told CHILD VICTIM 1 to make sure that he, COX, doesn't go to jail.

59.     **Witness Interview**: On January 13, 2016, Det. Smith interviewed a cooperating minor witness regarding the investigation.  This witness reported that, on the day before COX resigned, COX messaged CHILD VICTIM 1 using Instagram and said, "you got a new phone" and "am I getting fired?"

---

[2] CHILD VICTIM 1 provided his Instagram username as Kylecox4.

60.    The cooperating witness saw these messages on the phone of CHILD VICTIM 1.  The witness said that CHILD VICTIM 1 didn't respond to the message but became very visibly upset.  COX sent CHILD VICTIM 1 another message later asking CHILD VICTIM 1 to lie and tell everyone that she had used COX's iPad in his office and planted the text messages on it.

61.    **Forensic examinations**: Forensic examinations of the digital devices seized in this investigation were done by IMPD Detectives Grant Melton, Matt Shores and Brett Seach of the Digital Forensics Units.  This affiant has worked with these forensic examiners in multiple investigations of crimes against children. Their examinations have been used in investigations that have resulted in charges being filed in state and federal courts.

62.    This Affiant learned that, on December 15, 2015, the school permitted COX to take a school computer off of school property and to remove "personal" files from it.  COX returned the computer the next day.  During this period, he had unsupervised access to the data on the computer.

63.    Forensic examinations were performed on the cell phone recovered from COX, the cell phone used by CHILD VICTIM 1, and the devices used by FATHER to preserve the text messages.

64.    The forensic examinations showed that the text messages recovered were sent between the phone number associated with the phone recovered from COX at his residence on January 7, 2016 and the cell phone used by CHILD VICTIM 1 during the relevant times.

65. A review of the forensic examination of the cell phones used by COX and CHILD VICTIM 1 (as well as devices used by FATHER to preserve the text messages) shows that COX actively engaged in multiple sexually explicit text conversations with CHILD VICTIM 1.

66. In reviewing these text messages, the affiant observed that during the conversations between COX and CHILD VICTIM 1, COX would send and receive text messages that were sexual in nature and that he received from CHILD VICTIM 1 images and/or videos of sexually explicit conduct. It appears that COX and CHILD VICTIM 1 would communicate with words through text messaging and would send images primarily through other platforms, such as Snapchat.

67. **Snapchat** is a video messaging application. "Using the application, users can take photos, record videos, add text and drawings, and send them to a controlled list of recipients. These sent photographs and videos are known as "Snaps." Users set a time limit for how long recipients can view their Snaps (as of September 2015, the range is from 1 to 10 seconds), after which Snapchat claims they will be deleted from the company's servers." *Wikipedia, https://en.wikipedia.org/wiki/Snapchat.*

68. There are references through the text messages between COX and CHILD VICTIM 1 specifically related to the word "Snap". Through my training and experience, I know that images and videos are often exchanged through this social media app "Snapchat."

69.     In order to simultaneously communicate through text messaging and Snapchat, the phone user would have to switch back and forth between apps.   The perceived benefit of using Snapchat is that users believe that all images and videos are only viewed for a short period of time and then automatically deleted.

70.     In order to reconstruct the communication chain between COX and CHILD VICTIM 1, the forensic examiners and detectives used communications forensically recovered from the cell phones of CHILD VICTIM 1, the computer used by the family of CHILD VICTIM 1, screen shots taken by the father of CHILD VICTIM 1, and the cell phone recovered from COX's person.

71.     In several of these text conversations, COX asks for and acknowledges receipt of images and/or videos from CHILD VICTIM 1. Within the recovered messages, the first reference of a request by COX for a sexual image of CHILD VICTIM 1 occurred on October 7, 2015.  COX sent a text message, asking CHILD VICTIM 1 to send a picture of her body.  CHILD VICTIM 1 replied, but it is forensically unclear whether she sent an image or a video.  COX responded to what CHILD VICTIM 1 sent by writing "I know that's what I'm saying! I got it . . ." and then her refers to a portion of her body.

72.     **Enticement, Sexual Exploitation and Child Pornography**: Based on the content of the messages between COX and CHILD VICTIM 1, the Affiant believes that COX persuaded, induced, enticed, or coerced CHILD VICTIM 1 to take images and videos of herself engaged in sexually explicit

conduct so that he could obtain the resulting depictions from her, which he then received and viewed to fuel his sexual fantasies.

73. On multiple occasions, between October 7, 2015 and December 15, 2015, COX sent text messages or used social media apps with messaging services to receive the images and videos.

74. On October 23, 2015, a stream of text communication leads this Affiant to believe that COX received at least one lascivious image of CHILD VICTIM 1's genital or pubic area.

75. On November 12, 2015, COX and CHILD VICTIM 1 communicated by text messaging. This Affiant believes, based on the content of the messages, that COX received an image of CHILD VICTIM 1 engaging in sexually explicit conduct. COX also referenced formerly sent photos and / or videos, which this Affiant would infer are sexually explicit images of CHILD VICTIM 1, when COX wrote which included explicit references to sexual content.

76. On November 16, 2015, a stream of text communication leads this Affiant to believe that COX received a series of lascivious images of CHILD VICTIM 1. These images, which may have been part of a video, were forensically recovered and this affiant has reviewed them. They meet the definition of a visual depiction of a minor engaging in sexually explicit conduct noted above. COX discussed the contents of these images with CHILD VICTIM 1 in recovered text messages.

77. On November 28, 2015, COX told that CHILD VICTIM 1 to send a Snapchat of bras that she had just purchased. After Child Victim 1 responded

in text messages that she would do that, COX replied with a reference approving of the content. This Affiant would conclude that COX had received, through Snapchat, an image sent by CHILD VICTIM 1, in between the text messages that COX sent to her.

78. On or about November 28, 2015, the father of CHILD VICTIM 1 saw text messages between CHILD VICTIM 1 and a phone number of 765-***-**** with a contact name of "CKC" on the phone of CHILD VICTIM 1 . These text messages included images and videos of the exposed pubic or genital area of a male and a female.

79. On December 11, 2015, the Affiant believes, based on the digital evidence found, that COX persuaded, enticed, induced, and coerced Child Victim 1 sent to COX a video of her engaging in sexually explicit conduct. This video was forensically recovered and this affiant has reviewed it. It meets the definition of a visual depiction of a minor engaging in sexually explicit conduct noted above.

80. **Attempted Enticement To Engage In Sexual Activity And The Sexual Exploitation Of A Minor Child**: In Det. Smith's interview with CHILD VICTIM 1, she described COX's plan to meet up with her for the purpose of engaging in sexual activity, which would constitute a violation of Indiana Code 35-42-4-9 (Sexual Misconduct with a Minor). COX told CHILD VICTIM 1 of this plan through cellular-based or internet-based communications (in text messages or through social media apps with messaging services).

81. CHILD VICTIM 1 said that COX planned this meeting as far back as October 22, 2015. COX later told her that his wife and children were going out of town during the weekend of December 19, 2015. Park Tudor Basketball Team also had an away game that was scheduled for the afternoon of that day.

82. COX's plan was for CHILD VICTIM 1 to tell her parents that she was staying with a friend, and she was going to sneak into his vehicle after the away game and spend the night at his home. COX was then going to take her back home. CHILD VICTIM 1 said they spoke about the plans for the meeting and that he was going to have sexual intercourse with her.

83. Recovered messages corroborate CHILD VICTIM 1's account of COX's attempts to induce, entice, persuade, or coerce CHILD VICTIM 1 to engage in sexual activity.

84. On October 22, 2015, COX told CHILD VICTIM 1, "I think I'm gonna be home alone in December." Three days earlier, on October 19, 2015, COX wrote to CHILD VICTIM 1, stating: "If we were alone all night and we had done everything but sex would you want it before I left".

85. On October 24, 2015, CHILD VICTIM 1 and COX had a text-message conversation about specific plans to engage in sexual activities, which acts would constitute the offense of SEXUAL MISCONDUCT WITH A MINOR, a violation of the Indiana Code.

86. Later on October 24, 2015, COX exchanged text-messages with CHILD VICTIM 1 discussing sexual activity. COX instructed her to engage in

sexually explicit conduct in furtherance of his goal to engage in sexual activity with CHILD VICTIM 1.

87. On November 16, 2015, COX described specific sex acts which he wanted to perform with Child Victim 1, all of which constitute violations of Indiana Code (Sexual Misconduct with a Minor).

88. In a message stream from November 28, 2015, COX again referenced the plan to have CHILD VICTIM 1 come to his home in December for the purpose of engaging in sexual activity with him. He stated that he wanted to take sexually explicit images of the activity.

89. This Affiant verified that the Park Tudor team that COX coached had an away game, which was earlier in the same day COX planned to take CHILD VICTIM 1 to his house.

90. As previously noted, COX also attempted to entice CHILD VICTIM 1 to meet him at two locations at the school to engage in sexually explicit conduct.

91. When discussing Cox's plan to have CHILD VICTIM 1 come to his house for the purpose of engaging in sexual activity with her, COX told CHILD VICTIM 1, "You better turn off all locations." When COX warned CHILD VICTIM 1 "I swear if you ever say something".

92. While COX laid out his plans to CHILD VICTIM 1, he described his preparations in detail. He also described the sexual activity as "It's my idea".

93. On December 12, 2015, COX wrote a message attempting to induce, entice, persuade or coerce CHILD VICTIM 1 to meet him for sexual

activity at the school after a home basketball game. He facilitated this by providing information about how to access a restricted area of the building.

94. This Affiant verified that, on December 12, 2015, the basketball team had a home game.

95. CHILD VICTIM 1 did not meet COX as he planned that day, despite his attempts to persuade, induce, entice, and coerce her to do so. However, the related text messages show his intent to engage in sexual activity and his disappointment when his plan failed. He also stated that they would not have been seen by other persons at the school.

96. **OBSTRUCTION OF JUSTICE**: This Affiant learned that on December 15, 2015, the school signed a confidentiality agreement with COX which, among other things, prohibited COX from having any communications with any Park Tudor students and from discussing the reason for his resignation other than as required by law. The Confidentiality Agreement stated that COX resigned his employment at the School.

97. On December 16, 2015, a day after his resignation from the school, COX exchanged text messages with a male student who attended the school. COX discussed what was likely going to happen with COX now and fallout of the events with CHILD VICTIM 1.

98. COX stated that everyone was supporting him and that he could work anywhere in the state. COX discussed various coaching jobs in which he was interested and told the student: "the nice thing is that I can get any job in the state. . . . I've positioned myself to be marketable."

99. In discussing CHILD VICTIM 1, COX wrote in a text message sent to the male student on December 16, 2015, stating: "I would turn my head if you messed her up." The affiant believes that this was a reference to hurting CHILD VICTIM 1.

100. COX continued texting the student, admonishing "Just keep your nose clean."

101. On December 17, 2015, COX told the student to "ask her [CHILD VICTIM 1] if it's making her feel better to slander me." COX then told the student "I'm sure you'll find the right chance to say something to her."

102. **INTERSTATE COMMERE:** COX received the images, videos and text communications in question by means of text messaging, Snapchat, or other social media apps with messaging services, which are means and facilities of interstate commerce. Snapchat Headquarters are located in California. Instagram Headquarters are located in California. The cell phone of CHILD VICTIM 1 and COX's cell phone, used to transmit and receive the text messages in question, are manufactured outside of the State of Indiana.

103. **Conclusion**: Based upon the contents of this Affidavit, I respectfully request that the Court issue a Criminal Complaint and Arrest Warrant for Cox charging him with the offense listed above.

_____
Det. Darin Odier
FBI Task Force Officer

Subscribed and sworn to before me on February 4, 2016

_____
Mark J. Dinsmore
United States Magistrate Judge